Horace C. BYNUM et al., Plaintiffs,

v.

Victor H. SCHIRO, Individually and as Mayor of the City of New Orleans, et al., Defendants.

Civ. A. No. 12439.

United States District Court
E. D. Louisiana,
New Orleans Division.

July 1, 1963.

Ernest N. Morial, A. P. Tureaud, A. M. Trudeau, Jr., New Orleans, La., Robert L. Carter, New York City, for plaintiffs.

Alvin J. Liska, Ernest L. Salatich, New Orleans, La., Jack P. Gremillion, Baton Rouge, La., Wm. P. Schuler, Arabi, La., for defendants.

Before WISDOM, Circuit Judge, and AINSWORTH and ELLIS, District Judges.

WISDOM, Circuit Judge.

In this class action the plaintiffs, New Orleans Negroes, ask the City of New Orleans for equal treatment of Negroes at the Municipal Auditorium. They complain on two counts. (1) As individuals for themselves and for all Negroes similarly situated, they complain that at all

public functions held in the Auditorium, the City requires the audience to be segregated by race. (2) As officers of the New Orleans Chapter of the National Association for the Advancement of Colored People, the plaintiffs complain that the City discriminates against the NAACP and similar organizations by denying the use of the Auditorium to organizations advocating desegregation.

■ Cities may as well face up to the facts of life: New Orleans, here and now, must adjust to the reality of having to operate desegregated public facilities. Time has run out. There is no defense left. There is no excuse left—no excuse which a court, bound by respect for the Rule of Law, could now legitimize as a legal justification for a city's continued segregation of governmental facilities. There is left not even that last ditch, token desegregation: gradual desegregation in the name of "deliberate speed" has no application to a municipal auditorium or to other publicly owned or operated facilities presenting none of the administrative problems inherent in remaking a public school system.

We find for the plaintiffs and grant their prayer for a preliminary injunction.

## I.

A. There is no substantial dispute over the facts as they relate to the City's policy and practice of separating the races in the Auditorium. Counsel for the plaintiffs called as witnesses Mr. Wiltz Wagner, Managing Director of the Auditorium, and his chief clerk, Mrs. Melda Boyd, who has been with the Auditorium thirty-four years. They testified that as a matter of policy the City requires segregated seating at all "open" meetings held in the Auditorium. An "open" meeting, they explained, is one open to the public or one for which tickets are sold without restriction. A concert of the New Orleans Symphony is an example of an "open" meeting. The Auditorium does not prescribe segregation at religious meetings [1] and "closed" meetings.

Mr. Horace C. Bynum, one of the plaintiffs, a member of the NAACP for twenty years and a Vice-President of the New Orleans Branch in 1962, testified that he applied to the Auditorium for its use for a "kick-off" meeting in a campaign to increase the membership of the local NAACP. Mr. Wagner told him that the application had to be refused because the NAACP advocated desegregation. Mr. Bynum testified that the NAACP in New Orleans had never urged the violation of a city or state law and that its policy was to seek redress through the courts. He said that he had attended a prize fight at the Auditorium where he was required to sit in a seat in a segregated section reserved for Negroes only. He assumed, based on the segregated audience, although he did not leave his seat during the fight, that there were separate washrooms and drinking fountains for Negroes. The record is otherwise silent as to segregation of these facilities. Mr. Anderson V. Washington, another plaintiff, corroborated Mr. Bynum's testimony as to the NAACP's request for the Auditorium and the reason for its rejection.

The regular form lease the Auditorium uses contains the following provision:

"This agreement is made and entered into upon the following express covenants and conditions, all and every one of which the lessee hereby covenants and agrees to and with the lessor to keep and perform.

"1. That said lessee will comply with all laws of the United States, and of the State of Louisiana, all ordinances of the City of New Orleans, and all rules and requirements of the police and fire departments, or other municipal authority of the City of New Orleans, and will obtain and pay for all necessary permits and licenses, and will not do, nor suffer to be done, anything on said premises during the term of this lease in violation of any such laws, ordinances, rules or requirements, and if the attention of said lessee is called to any such violation on the part of said

---

1. The Act excludes "religious gatherings, services or functions." LSA–R.S. 4:455.

lessee, or of any person employed by or admitted to the said premises by said lessee, such lessee will immediately desist from and correct such violation."

The effect of this provision is to require the licensee to agree to comply with the Louisiana Anti-Mixing Statute of 1956, LSA–R.S. 4:452–455.[2] LSA–R.S. 4:452 requires the sponsors or persons in control of premises where "entertainment or athletic contests" are held to provide separate seating arrangements and separate facilities for members of the white and Negro races.[3] LSA–R.S. 4:453 prohibits whites and Negroes from sitting in or using any part of seating arrangements and sanitary or other facilities set apart for members of either race. LSA–R.S. 4:454 provides the penalty for the violation of LSA–R.S. 4:452 and 4:453.

On the facts, the City, with commendable honesty, offered no countervailing evidence of its policy and practice of enforcing segregation at the Auditorium.

On the law, the City closed its eyes to overwhelming high legal authority, stood up for its Auditorium policy, and defended the constitutionality of anti-mixing laws as a proper exercise of the police power.

■ B. "[I]t is no longer open to question that a State [or City] may not constitutionally require segregation of public facilities." 'Johnson v. Virginia, 1963, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed. 2d 195. In that case the Court held that a city may not segregate seating in courtrooms. In other cases courts have held that public parks and playgrounds (Watson v. City of Memphis, 1963, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529), public beaches and bathhouses (Dawson v. Mayor and City Council of Baltimore, 4 Cir. 1955, 220 F.2d 386, aff'd per curiam 1935, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774), golf courses (New Orleans City Park Improvement Ass'n v. Detiege, 5 Cir. 1958, 252 F.2d 122, aff'd per curiam, 358 U.S. 54, 79 S.Ct. 99, 3 L.Ed.2d 46), and restaurants in public

2. In Dorsey v. State Athletic Commission, 168 F.Supp. 149, aff'd 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028, reh'g den'd 360 U.S. 940, 79 S.Ct. 1146, 3 L.Ed.2d 1552, involving the right of a Negro prize fighter to engage in boxing match with a white prize fighter, this Court held that LSA–R.S. 4:451 was unconstitutional.

3. "§ 451. Interracial activities involving personal and social contacts prohibited

"All persons, firms and corporations are prohibited from sponsoring, arranging, participating in, or permitting on premises under their control any dancing, social functions, entertainments, athletic training, games, sports or contests and other such activities involving personal and social contacts, in which the participants or contestants are members of the white and negro races."

"§ 452. Separate seating and facilities

"At any entertainment or athletic contests, where the public is invited or may attend, the sponsors or those in control of the premises shall provide separate seating arrangements, and separate sanitary, drinking water and any other facilities for members of the white and negro races, and to mark such separate accommodations and facilities with signs printed in bold letters."

"§ 453. Races prohibited from using the other seating and facilities

"White persons are prohibited from sitting in or using any part of seating arrangements and sanitary or other facilities set apart for members of the negro race; and members of the negro race are prohibited from sitting in or using any part of seating arrangements and sanitary or other facilities set apart for white persons."

"§ 454. Penalty

"Any person, firm or corporation violating the provisions of this chapter shall be guilty of a misdemeanor and, upon conviction, shall be fined not less than $100.00 or more than $1,000.00 and imprisoned for not less than 60 days nor more than 1 year.

"§ 455. Construction; effective date; religious gathering exempt

"This Chapter is passed in the exercise of the state police power to regulate public health, morals and to maintain peace and good order in the state and shall be so construed. This Chapter shall not become effective until the fifteenth (15th) day of October, 1956. None of the provisions of this Chapter shall be construed to apply to religious gatherings, services or functions."

buildings (Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 81 S. Ct. 856, 6 L.Ed.2d 45) may not be segregated.

■ In view of these decisions and numerous others which might be cited, we hold that the 1956 Louisiana Anti-Mixing Law, LSA–R.S. 4:451, 452, 453, 454, 455, is unconstitutional. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." Hirabayashi v. United States, 1943, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774, 1786. "[R]acial classifications are 'obviously irrelevant and invidious.'" Goss v. Board of Education, 1963, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632. The humiliation of being restricted to a certain area in the Auditorium is sufficient harm to give the plaintiffs standing to sue. Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.

■ The able counsel for the State argues persuasively that the constitutionality of the statute is not at issue, since a kick-off meeting for a membership campaign is neither an "entertainment" nor an "athletic contest" and therefore does not come within the coverage of the statute. This argument would be more effective if the plaintiffs objected only to the City's refusal of the Auditorium to the NAACP and if the basis for the City's denial of the application were only the statute. But the complaint objects to segregation generally at the Auditorium. The evidence shows that all open meetings, including entertainments and athletic contests, were segregated. Bynum testified that he was required to sit in a segregated section at a prize fight in the Auditorium. The City asserted the statute as a defense. In view of these circumstances, the constitutionality of the statute is at issue. To the extent that the City relied on the law, the City relied on a law unconstitutional on its face.

■ C. The City's segregation policy, enforced and carried out at the Auditorium, amounts to city action to the same extent as if it were a city ordinance. "A State, or a city, may act as authoritatively through its executive as through its legislative body." Lombard v. Louisiana, 1963, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338.

■ The City asserts here, as it did in McCain v. Davis, 1963, E.D.La., 217 F. Supp. 661, and as it has asserted again and again in civil rights cases, as if there were no established jurisprudence, that segregation is a proper exercise of the police power to prevent disorder. This notion shows a complete misunderstanding of our federal system and the nature of rights protected under the United States Constitution. Thus, the Supreme Court has said:

"It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution." Buchanan v. Warley, 245 U.S. 60, at 81, 38 S.Ct. 16, at 20, 62 L.Ed. 149.

That statement was made with regard to a city ordinance segregating Negroes and white persons by residential areas. The Supreme Court repeated the statement in Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, a case involving the tense racial feelings generated by the desegregation of Little Rock schools. The Court added: "[L]aw and order are not here to be preserved by depriving the Negro children of their constitutional rights."

Again the Court repeated the quotation from Buchanan v. Warley, May 27, 1963, in Watson v. City of Memphis, 373 U.S. 526, 83 S.Ct. 1314, 1321, 10 L.Ed. 529. There the Court held that the City of Memphis must desegregate its parks and playgrounds without delay: "Constitutional rights are to be promptly vindicated."

The City has a lonely dictum from Garner v. Louisiana, 1961, 368 U.S. 157, 82

S.Ct. 248, 7 L.Ed.2d 207, to quote in support of its position. In that case the Supreme Court reversed the convictions of three Negro sit-in demonstrators on the ground that the record was totally devoid of any evidence to support their conviction for a breach of the peace. The Court stated that the Louisiana breach of the peace statute might be construed to "permit the police to prevent an imminent public commotion even though caused by peaceful and orderly conduct." But the case before us is not one in which the plaintiffs are accused of breach of the peace or of causing foreseeable imminent public disorder. The City called no witnesses to the stand, and the only evidence the City introduced was in the form of two affidavits from public health officials showing the incidence of venereal diseases in white persons and Negroes in the City and State.

In short, it cannot be said that segregation at the Auditorium has any basis in the "clear and present danger" doctrine. The requirement that an audience be segregated at symphony concerts in the Municipal Auditorium is a vestigial remnant from earlier days in our evolution, comparable to the vermiform appendix.

■ We hold that the Auditorium policy and practice of requiring segregation as part of the City's traditional pattern of operating public facilities offend both the Equal Protection and Due Process Clauses of the Constitution.

## II.

Some time in April 1962 the New Orleans Chapter of the NAACP asked for the use of the Auditorium for the purpose of holding a kick-off meeting of a campaign to increase NAACP membership. The plaintiffs were prepared to pay an additional sum they were told would be needed for extra guards. The City refused the application. A letter of April 16, 1962, gives the following explanation:

"Please be advised that the Auditorium Advisory Committee has decided unanimously to adhere to the policy adopted several years ago to refuse the use of the building to any person or organization who is known to urge violation of existing laws and customs relating to segregation of the races in this City and State.

"Under the circumstances, you are hereby advised that the application is denied."

There is no evidence before us to indicate that the local NAACP Chapter or any of its members has ever urged the "violation of existing laws and customs relating to segregation". On the contrary, the immense volume of litigation initiated by the local chapter of the NAACP in this Court attests to its policy of seeking redress in the courts.

On the stand, Mr. Wagner, Manager of the Auditorium, gave a different explanation for rejection of the application. He testified that when a request is made for use of the building for a meeting the policy is to require prospective users to submit the names of their speakers. In this instance the plaintiffs supplied three names of possible speakers: (1) Judge Thurgood Marshall (who had been appointed to the United States Court of Appeals for the Second Circuit and was then serving on the court but had not yet been confirmed); (2) United States Congressman Adam Clayton Powell; and (3) Mr. Robert Weaver, Head of the United States Housing Administration. Apparently, as the letter of April 16 indicates, the City concluded that the character of these speakers or of the local NAACP chapter brought the meeting within the Auditorium's policy of prohibiting the use of the building to any "person or organization who is known to urge violation of existing laws and customs relating to segregation." Neither Mr. Wagner nor Mrs. Boyd, however, was willing to testify to that effect. Mr. Wagner did not remember that two of the possible speakers were Congressman Powell and Housing Administrator Weaver. Mrs. Boyd did not know who Mr. Weaver was. She had heard of Judge Marshall and Congressman Powell.

Counsel for the City, on cross-examination, attempted to show that in March and April 1962 another organization, the Consumers League, had picketed certain businesses and had demonstrated outside of the Orleans Parish Registration Office. The plaintiffs testified that they were not members of the Consumers League and had not participated in any such picketing or demonstration. The record shows no evidence that at the time of the NAACP's application there was unusual tension between the races.

■■ On this evidence we find that, without even the pretense of requiring a showing of a clear and present danger, the City conditioned the use of the Auditorium on the speakers' advocating views compatible with the City's policy of segregation. In a city building intended for public assemblies, Negroes could not obtain the use of the building except by surrendering freedom of speech. The City has no power to make its license to an auditorium-user depend on the licensee's giving up a constitutional right. Frost & Frost Trucking Co. v. Railroad Commission, 1926, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101; Hague v. Committee for Industrial Organization, 1939, 307 U. S. 496, 59 S.Ct. 954, 83 L.Ed. 1423.

Thus, in Cantwell v. Connecticut, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, the Supreme Court held that an ordinance giving discretionary power to license the right to solicit for a religious cause violated the First Amendment, applicable to the States under the Fourteenth Amendment. The Court said:

"[T]o condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution. 310 U.S. at 307, 60 S.Ct. 904, 84 L.Ed. at 1219."

In Danskin v. San Diego Unified School District, 1946, 28 Cal.2d 536, 171 P.2d 885, Judge Traynor for the Supreme Court of California said:

"The state is under no duty to make school buildings available for public meetings. * * * If it elects to do so, however, it cannot arbitrarily prevent any members of the public from holding such meetings. * * * Nor can it make the privilege of holding them dependent on conditions that would deprive any members of the public of their constitutional rights. A state is without power to impose an unconstitutional requirement as a condition for granting a privilege even though the privilege is the use of state property. * * * The very purpose of a forum is the interchange of ideas, and that purpose cannot be frustrated by a censorship that would label certain convictions and affiliations suspect, denying the privilege of assembly to those who held them, but granting it to those whose convictions and affiliations happened to be acceptable and in effect amplifying their privilege by making it a special one."

See also New Orleans v. Hood, 1947, 212 La. 485, 32 So.2d 899.

Here the public officials object to licensing persons preaching the equality of man. The Declaration of Independence has something to say about the equality of man. And Congress has made it national policy in numerous statutes. The courts, in countless decisions, have made it a reality in public institutions and governmental facilities. The City's conditional prohibition of free discussion of segregation in an auditorium built, in part, to serve as a public forum, is a plain denial of due process.

■ The City's action is also a discriminatory practice in violation of the Equal Protection Clause. A municipality cannot deny the use of a public building to one organization while "permission is freely granted to others [similar organizations] applying, [for the use of the building] * * * for the purpose of public assembly and discussion." Ellis

v. Dixon, 1955, 349 U.S. 458, 75 S.Ct. 850, 99 L.Ed. 1231. Here, the favored organization, similar to the NAACP, is the White Citizens Council.

While turning down the NAACP's request for the Auditorium, the City granted the White Citizens Council an open lease arrangement allowing it to use the Auditorium at any time not in conflict with a previous commitment. The major interest of each of these organizations is in the great national debate over civil rights. As everyone knows, they are on opposite sides of the argument. But each organization uses public meetings to obtain popular support for its point of view and to increase its membership. Each organization is highly controversial.

We take notice of the two organizations through the reported decisions and the litigation in this Court. For sake of argument, we may accept the criterion that the Auditorium should not be licensed to any user likely to cause disorder by increasing racial tensions. By such a criterion, or by any other criterion (based on the evidence before us and such facts of which we may take notice), the lease of the Auditorium to the White Citizens Council and the denial of a lease to the New Orleans Branch of the NAACP was rank discrimination in violation of the Equal Protection Clause of the Constitution.

### III.

The role of the City Council is not clear. On the evidence before us, we dismiss the members of the Commission Council of the City of New Orleans as parties defendant, individually and as councilmen, because the plaintiffs have made no showing that the councilmen, individually or collectively, are able under the City's charter to give the relief sought.

### IV.

Here, as in McCain v. Davis, 1963, E. D.La., 217 F.Supp. 661, it might be said there is so little substance to the constitutional questions the City raises that a three-judge court should not decide the case. In the interest of expediting

justice, however, we adopt the procedure used in McCain v. Davis, 1963, E.D.La., 217 F.Supp. 661; United States v. Manning, 1962, W.D.La., 206 F.Supp. 623; and United States v. Lassiter, 1962, W. D.La., 203 F.Supp. 20.

The defendants' motions are overruled. A preliminary injunction is granted substantially as prayed for in the complaint. A judgment will be drawn accordingly.

AINSWORTH and FRANK B. ELLIS, District Judges, concur in the result.