## POLICE DEPARTMENT OF THE CITY OF CHICAGO ET AL. v. MOSLEY

No. 70–87. Argued January 19, 1972—Decided June 26, 1972

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, STEWART, WHITE, and POWELL, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 102. BLACKMUN and REHNQUIST, JJ., concurred in the result.

*Richard L. Curry* argued the cause for petitioners. With him on the briefs were *William R. Quinlan* and *Edmund Hatfield.*

*Harvey J. Barnett* argued the cause for respondent. With him on the brief were *Ronald L. Barnard* and *Hal M. Brown.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

At issue in this case is the constitutionality of the following Chicago ordinance:

"A person commits disorderly conduct when he knowingly:

.　　　.　　　.　　　.　　　.

"(i) Pickets or demonstrates on a public way within 150 feet of any primary or secondary school build-

ing while the school is in session and one-half hour before the school is in session and one-half hour after the school session has been concluded, provided that this subsection does not prohibit the peaceful picketing of any school involved in a labor dispute . . . ." Municipal Code, c. 193–1 (i).

The suit was brought by Earl Mosley, a federal postal employee, who for seven months prior to the enactment of the ordinance had frequently picketed Jones Commercial High School in Chicago. During school hours and usually by himself, Mosley would walk the public sidewalk adjoining the school, carrying a sign that read: "Jones High School practices black discrimination. Jones High School has a black quota." His lonely crusade was always peaceful, orderly, and quiet, and was conceded to be so by the city of Chicago.

On March 26, 1968, Chapter 193–1 (i) was passed, to become effective on April 5. Seeing a newspaper announcement of the new ordinance, Mosley contacted the Chicago Police Department to find out how the ordinance would affect him; he was told that, if his picketing continued, he would be arrested. On April 4, the day before the ordinance became effective, Mosley ended his picketing next to the school.[1] Thereafter, he brought this action in the United States District Court for the Northern District of Illinois, seeking declaratory and injunctive relief, pursuant to 28 U. S. C.

---

[1] Occasionally, thereafter, Mosley would picket across the street, outside the 150-foot zone. At the hearing below, Mosley testified that "when I was across the street from the school, 150 feet away, you cannot hardly see me. The question that all of the people asked me was, 'Where is the school located?' They don't even see the school across the street, you know. So, what it does, it takes away a certain amount of the effectiveness . . . . [W]hen I am across the street, I am sort of out of the picture . . . ." App. 24–25.

§ 2201 and 42 U. S. C. § 1983. He alleged a violation of constitutional rights in that (1) the statute punished activity protected by the First Amendment; and (2) by exempting only peaceful labor picketing from its general prohibition against picketing, the statute denied him "equal protection of the law in violation of the First and Fourteenth Amendments . . . ."

After a hearing, the District Court granted a directed verdict dismissing the complaint. The Seventh Circuit reversed, holding that because the ordinance prohibited even peaceful picketing next to a school, it was overbroad and therefore "patently unconstitutional on its face." 432 F. 2d 1256, 1259 (1970). We granted certiorari, 404 U. S. 821 (1971), to consider this case along with *Grayned* v. *City of Rockford, post,* p. 104, in which an almost identical ordinance was upheld by the Illinois Supreme Court, 46 Ill. 2d 492, 496, 263 N. E. 2d 866, 868 (1970). We affirm the judgment of the Seventh Circuit, although we decide this case on the ground not reached by that court. We hold that the ordinance is unconstitutional because it makes an impermissible distinction between labor picketing and other peaceful picketing.

## I

The city of Chicago exempts peaceful labor picketing from its general prohibition on picketing next to a school.[2] The question we consider here is whether this selective exclusion from a public place is permitted. Our answer is "No."

Because Chicago treats some picketing differently from others, we analyze this ordinance in terms of the

---

[2] By its terms, the statute exempts "the peaceful picketing of any school involved in a labor dispute." It is undisputed that this exemption applies only to *labor* picketing of a school involved in a labor dispute.

Equal Protection Clause of the Fourteenth Amendment. Of course, the equal protection claim in this case is closely intertwined with First Amendment interests;[3] the Chicago ordinance affects picketing, which is expressive conduct; moreover, it does so by classifications formulated in terms of the subject of the picketing. As in all equal protection cases, however, the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment. See *Reed* v. *Reed,* 404 U. S. 71, 75–77 (1971); *Weber* v. *Aetna Casualty Co.,* 406 U. S. 164 (1972); *Dunn* v. *Blumstein,* 405 U. S. 330, 335 (1972).

The central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter. Peaceful picketing on the subject of a school's labor-management dispute is permitted, but all other peaceful picketing is prohibited. The operative distinction is the message on a picket sign. But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. *Cohen* v. *California,* 403 U. S. 15, 24 (1971); *Street* v. *New York,* 394 U. S. 576 (1969); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 269–270 (1964), and cases cited; *NAACP* v. *Button,* 371 U. S. 415, 445 (1963); *Wood* v. *Georgia,* 370 U. S. 375, 388–389 (1962); *Terminiello* v. *Chicago,* 337 U. S. 1, 4 (1949); *De Jonge* v. *Oregon,* 299 U. S. 353, 365 (1937). To permit the continued building of our politics

---

[3] For discussions of the First Amendment-Equal Protection intersection, see Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 29–30; T. Emerson, The System of Freedom of Expression 303–304, 305–307 (1970). Blasi, Prior Restraints on Demonstrations, 68 Mich. L. Rev. 1482, 1492–1497 (1970); Van Alstyne, Political Speakers at State Universities: Some Constitutional Considerations, 111 U. Pa. L. Rev. 328, 337–339 (1963); see also *Niemotko* v. *Maryland,* 340 U. S. 268, 272 (1951).

and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan, supra,* at 270.

Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas," [4] and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

Guided by these principles, we have frequently condemned such discrimination among different users of the same medium for expression. In *Niemotko* v. *Maryland,* 340 U. S. 268 (1951), a group of Jehovah's Witnesses were denied a permit to use a city park for Bible talks, although other political and religious groups had been allowed to put the park to analogous uses. Concluding that the permit was denied because of the city's "dislike for or disagreement with the Witnesses

---

[4] A. Meiklejohn, Political Freedom: The Constitutional Powers of The People 27 (1948).

or their views," this Court held that the permit refusal violated "[t]he right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments." *Id.,* at 272. The Court followed *Niemotko* in *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953), where again the Jehovah's Witnesses were refused permission to conduct religious services in a park, although other religious groups had been permitted to do so. Similarly, because of their potential use as instruments for selectively suppressing some points of view, this Court has condemned licensing schemes that lodge broad discretion in a public official to permit speech-related activity, see, *e. g., Shuttlesworth* v. *Birmingham,* 394 U. S. 147 (1969); *Cox* v. *Louisiana,* 379 U. S. 536, 555–558 (1965); *Staub* v. *City of Baxley,* 355 U. S. 313, 321–325 (1958), and cases cited; *Saia* v. *New York,* 334 U. S. 558, 560–562 (1948).[5]

The late Mr. Justice Black, who thought that picketing was not only a method of expressing an idea but also conduct subject to broad state regulation, nevertheless recognized the deficiencies of laws like Chicago's ordinance. This was the thrust of his opinion concurring in *Cox* v. *Louisiana,* 379 U. S. 536 (1965):

> "[B]y specifically permitting picketing for the publication of labor union views [but prohibiting

---

[5] See also *Tinker* v. *Des Moines School District,* 393 U. S. 503, 510–511 (1969); *Adderley* v. *Florida,* 385 U. S. 39, 47 (1966); *Carlson* v. *California,* 310 U. S. 106, 112 (1940); *Wirta* v. *Alameda-Contra Costa Transit District,* 68 Cal. 2d 51, 434 P. 2d 982 (1967); *Bynum* v. *Schiro,* 219 F. Supp. 204 (ED La. 1963), aff'd, 375 U. S. 395 (1964); *East Meadow Assn.* v. *Board of Education,* 18 N. Y. 2d 129, 219 N. E. 2d 172 (1966); *Matter of Madole* v. *Barnes,* 20 N. Y. 2d 169, 229 N. E. 2d 20 (1967); *United States* v. *Crowthers,* 456 F. 2d 1074 (CA4 1972); and the litigation in *Ellis* v. *Dixon,* 349 U. S. 458 (1955). Cf. *Flower* v. *United States,* 407 U. S. 197 (1972).

other sorts of picketing], Louisiana is attempting to pick and choose among the views it is willing to have discussed on its streets. It thus is trying to prescribe by law what matters of public interest people whom it allows to assemble on its streets may and may not discuss. This seems to me to be censorship in a most odious form, unconstitutional under the First and Fourteenth Amendments. And to deny this appellant and his group use of the streets because of their views against racial discrimination, while allowing other groups to use the streets to voice opinions on other subjects, also amounts, I think, to an invidious discrimination forbidden by the Equal Protection Clause of the Fourteenth Amendment." *Id.*, at 581.

We accept Mr. Justice Black's quoted views. Cf. *NLRB v. Fruit & Vegetable Packers,* 377 U. S. 58, 76 (1964) (Black, J., concurring).

## II

This is not to say that all picketing must always be allowed. We have continually recognized that reasonable "time, place and manner" regulations of picketing may be necessary to further significant governmental interests. *Cox v. New Hampshire,* 312 U. S. 569, 575–576 (1941); *Poulos v. New Hampshire,* 345 U. S. 395, 398 (1953); *Cox v. Louisiana,* 379 U. S., at 554–555; *Cox v. Louisiana,* 379 U. S. 559 (1965); *Adderley v. Florida,* 385 U. S. 39, 46–48 (1966). Similarly, under an equal protection analysis, there may be sufficient regulatory interests justifying selective exclusions or distinctions among pickets. Conflicting demands on the same place may compel the State to make choices among potential users and uses. And the State may have a legitimate interest in prohibiting some picketing to protect public order. But these justifications for selective exclusions

from a public forum must be carefully scrutinized. Because picketing plainly involves expressive conduct within the protection of the First Amendment, see, e. g., *Thornhill* v. *Alabama*, 310 U. S. 88 (1940); *Teamsters Union* v. *Newell*, 356 U. S. 341 (1958); *Garner* v. *Louisiana*, 368 U. S. 157, 185 (1961) (Harlan, J., concurring in judgment); *Edwards* v. *South Carolina*, 372 U. S. 229 (1963); *Cox* v. *Louisiana, supra,* at 546; *Food Employees* v. *Logan Valley Plaza*, 391 U. S. 308, 314–315 (1968); *id.,* at 337 (WHITE, J., dissenting); *Gregory* v. *Chicago,* 394 U. S. 111, 112 (1969); *Shuttlesworth* v. *Birmingham,* 394 U. S., at 155, discriminations among pickets must be tailored to serve a substantial governmental interest. Cf. *Williams* v. *Rhodes*, 393 U. S. 23 (1968).

## III

In this case, the ordinance itself describes impermissible picketing not in terms of time, place, and manner, but in terms of subject matter. The regulation "thus slip[s] from the neutrality of time, place, and circumstance into a concern about content." [6] This is never permitted. In spite of this, Chicago urges that the ordinance is not improper content censorship, but rather a device for preventing disruption of the school. Cities certainly have a substantial interest in stopping picketing which disrupts a school. "The crucial question, however, is whether [Chicago's ordinance] advances that objective in a manner consistent with the command of the Equal Protection Clause." *Reed* v. *Reed,* 404 U. S., at 76. It does not.

---

[6] Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 29. Cf. *Cox* v. *Louisiana,* 379 U. S. 536, 556 n. 14, where the Court noted that the exemption for labor picketing in a statute otherwise barring on its face all street assemblies and parades, "points up the fact that the statute reaches beyond mere traffic regulation to restrictions on expression."

Although preventing school disruption is a city's legitimate concern, Chicago itself has determined that peaceful labor picketing during school hours is not an undue interference with school. Therefore, under the Equal Protection Clause, Chicago may not maintain that other picketing disrupts the school unless that picketing is clearly more disruptive than the picketing Chicago already permits. Cf. *Tinker* v. *Des Moines School District,* 393 U. S. 503, 511 (1969); *Wirta* v. *Alameda-Contra Costa Transit District,* 68 Cal. 2d 51, 434 P. 2d 982 (1967). If peaceful labor picketing is permitted, there is no justification for prohibiting all nonlabor picketing, both peaceful and nonpeaceful. "Peaceful" nonlabor picketing, however the term "peaceful" is defined, is obviously no more disruptive than "peaceful" labor picketing. But Chicago's ordinance permits the latter and prohibits the former. Such unequal treatment is exactly what was condemned in *Niemotko* v. *Maryland,* 340 U. S., at 272–273.

Similarly, we reject the city's argument that, although it permits peaceful labor picketing, it may prohibit all nonlabor picketing because, as a class, nonlabor picketing is more prone to produce violence than labor picketing.[7] Predictions about imminent disruption from picketing in-

---

[7] The city notes in its brief, pp. 28–30:

"Although the civil rights movement has understandably endeavored to press into its service the constitutional precedents developed in labor relations litigation, there are important differences between labor picketing and picketing by civil rights groups. . . . Labor picketing is now usually token picketing. . . . It seldom leads to disruption of the public peace, hardly ever to window smashing, arson. Labor picketing can be carried on without interrupting classes or even distracting the students. . . . As we all know, student demonstrations at schools—and even such demonstrations by parents and 'concerned citizens'—are utterly different. Mass picketing, sit-ins, smashed windows have been the order of the day. The very purpose of such demonstrations often is to bring the educational process to a halt."

volve judgments appropriately made on an individualized basis, not by means of broad classifications, especially those based on subject matter. Freedom of expression, and its intersection with the guarantee of equal protection, would rest on a soft foundation indeed if government could distinguish among picketers on such a wholesale and categorical basis. "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker* v. *Des Moines School District,* 393 U. S., at 508. Some labor picketing is peaceful, some disorderly; the same is true of picketing on other themes. No labor picketing could be more peaceful or less prone to violence than Mosley's solitary vigil. In seeking to restrict nonlabor picketing that is clearly more disruptive than peaceful labor picketing, Chicago may not prohibit all nonlabor picketing at the school forum.

The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives. *Williams* v. *Rhodes,* 393 U. S. 23 (1968); see generally *Dunn* v. *Blumstein,* 405 U. S., at 342–343.[8] Chicago may not vindicate its interest in preventing disruption by the wholesale exclusion of picketing on all but one preferred subject. Given what Chicago tolerates from labor picketing, the excesses of some nonlabor picketing may not be

---

[8] In a variety of contexts we have said that "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960). This standard, of course, has been carefully applied when First Amendment interests are involved. *E. g., Schneider* v. *State,* 308 U. S. 147, 164 (1939); *De Jonge* v. *Oregon,* 299 U. S. 353, 364–365 (1937); *Cantwell* v. *Connecticut,* 310 U. S. 296, 307 (1940); *NAACP* v. *Button,* 371 U. S. 415, 438 (1963); *Cox* v. *Louisiana,* 379 U. S. 559, 562–564 (1965); *United States* v. *O'Brien,* 391 U. S. 367 (1968).

controlled by a broad ordinance prohibiting both peaceful and violent picketing. Such excesses "can be controlled by narrowly drawn statutes," *Saia* v. *New York,* 334 U. S., at 562, focusing on the abuses and dealing even-handedly with picketing regardless of subject matter. Chicago's ordinance imposes a selective restriction on expressive conduct far "greater than is essential to the furtherance of [a substantial governmental] interest." *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968). Far from being tailored to a substantial governmental interest, the discrimination among pickets is based on the content of their expression. Therefore, under the Equal Protection Clause, it may not stand.[9]

The judgment is

*Affirmed.*

MR. JUSTICE BLACKMUN and MR. JUSTICE REHNQUIST concur in the result.

MR. CHIEF JUSTICE BURGER, concurring.

I join the Court's opinion but with the reservation that some of the language used in the discussion of the First

---

[9] Chicago argued below that the labor exemption in the ordinance was necessitated by federal pre-emption of the regulation of labor relations. The city now recognizes that the National Labor Relations Act specifically exempts States and subdivisions (and therefore cities and their public school boards) from the definition of "employer" within the Act. 29 U. S. C. § 152. Nevertheless, Chicago urges that the pre-emption argument still has "some merit." It argues that "since observance by employees of private employers of picket lines of public employees can have repercussions in the federal sphere, the City was well advised to avoid this quagmire of labor law and labor relations by exempting labor picketing from the ordinance." Reply Brief 12. This attenuated interest, at best a claim of small administrative convenience and perhaps merely a confession of legislative laziness, cannot justify the blanket permission given to labor picketing and the blanket prohibition applicable to others.

Amendment could, if read out of context, be misleading. Numerous holdings of this Court attest to the fact that the First Amendment does not literally mean that we "are guaranteed the right to express any thought, free from government censorship." This statement is subject to some qualifications, as for example those of *Roth* v. *United States,* 354 U. S. 476 (1957); *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942). See also *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964).