**LAWRENCE UNIVERSITY BICEN-TENNIAL COMMISSION et al., Plaintiffs,**

v.

**CITY OF APPLETON, WISCONSIN, a Municipal Corporation et al., Defendants.**

No. 76–C–183.

United States District Court, E. D. Wisconsin.

April 2, 1976.

James R. Hill and F. David Krizene-sky, Menasha, Wis., for plaintiffs.

Peter S. Nelson, Appleton, Wis., for defendants, Bd. of Ed. of the Appleton City School District, McClanahan, Becker, O'Connell, and Gibson.

David G. Geenen, City Atty., Appleton, Wis., for defendants, City of Appleton, Appleton City School District, and remaining defendants.

## MEMORANDUM DECISION AND ORDER

REYNOLDS, Chief Judge.

### I.

The circumstances giving rise to this lawsuit may be simply stated: The Board of Education of Joint School Dis-

trict No. 10, City of Appleton, et al., disapproved the Lawrence University Bicentennial Commission's application for permission to rent the Appleton High School East gymnasium on the evening of May 16, 1976, for purposes of a public lecture by Angela Davis. The complaint in this action alleges that this refusal to rent the facility in question constitutes a violation of certain rights secured to the plaintiffs by the First, Ninth, and Fourteenth Amendments to the Constitution of the United States. The complaint prays for injunctive relief, a declaratory judgment, damages, costs, and attorney's fees.

The plaintiffs' verified complaint was accompanied by a motion for a preliminary injunction directing the defendants to permit the plaintiffs to use the Appleton High School East gymnasium on the evening of May 16, 1976, for purposes of the Davis lecture. A hearing was held on the plaintiffs' motion on March 24, 1976, at the conclusion of which the Court orally granted the plaintiffs' motion. This memorandum decision and order follows in accordance with the requirements of Rules 52(a) and 65(d) of the Federal Rules of Civil Procedure.

## II.

Four plaintiffs are named in the complaint. The Lawrence University Bicentennial Commission (the "Commission") is alleged to be an unincorporated association of college students enrolled at Lawrence University in Appleton, Wisconsin. The Commission is alleged to have approximately thirteen members, and to have as its purpose the presentation of a lecture program in conjunction with the celebration of our nation's bicentennial year. Gary Weiss and Sharon Maquita Moody are alleged to be officers of the Commission and bring this suit as individuals and on behalf of the Commission. Jill Hoffenberg is alleged to be a taxpayer of Joint School District No. 10, City of Appleton, et al. (the "School District"), and brings suit on behalf of herself and a class of persons alleged to be similarly situated.

The complaint names eight persons and three entities as defendants. The defendant City of Appleton (the "City") is alleged to be a municipal corporation organized pursuant to the laws of the State of Wisconsin. The defendant School District is alleged to be operated by the City pursuant to Subchapter II of Chapter 120 of the Wisconsin Statutes. The defendant Board of Education of Joint School District No. 10, City of Appleton, et al. (the "Board"), is alleged to be the governing body of the School District. Defendants McClanahan, Becker, O'Connell, and Gibson are sued as individuals and in their official capacities as members of the Board. Defendants Sager, Lillge, and Heid are sued only in their official capacities as members of the Board. Defendant Zieman is sued in his official capacity as the administrator of the School District.

The complaint alleges that this court is vested with jurisdiction to consider the plaintiffs' claims pursuant to the provisions of §§ 1331, 1332, 1343, 2201, and 2202 of Title 28 of the United States Code. The complaint further alleges that this action is brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

■ At the outset, the Court notes that questions might well be raised as to the standing of plaintiff Hoffenberg and this court's subject matter jurisdiction over the claims which plaintiffs advance against the School District, the Board, and the City. See *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), and *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). The Court, however, hesitates to attempt a full resolution of the questions in the absence of a more extensive record and the arguments of counsel directed to such issues. For purposes of the motion for a preliminary injunction, it will suffice for the Court to hold that the complaint by the plaintiffs Lawrence University Bicentennial Commission, Weiss, and Moody amply states a cause of action under 42 U.S.C. § 1983 against the eight named individual defendants, cognizable in this court

pursuant to the jurisdictional provisions of 28 U.S.C. § 1343. See *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

### III.

Without foreclosing in any way the right of the parties to fully litigate genuine issues of fact upon the ultimate trial on the merits with respect to final relief, the Court makes the following findings of fact for purposes of deciding the plaintiffs' motion for a preliminary injunction. These findings of fact are based upon the records and affidavits on file in this action and the representations of counsel made in open court at the hearing in this matter held on March 24, 1976.

Sometime prior to February 23, 1976, the members of the plaintiff Commission decided to sponsor a public lecture by Angela Davis who is presently a professor at Claremont College, Claremont, California. The proposed subject of such lecture was "200 Years of Social Change in the United States." Angela Davis is a black woman, a member of the Communist Party of the United States, and the holder of a Doctor of Philosophy degree. Ms. Davis has previously given lectures on the subject of women's rights, the rights of black people, and the rights of those persons whom she believes are being held as political prisoners by various governments throughout the world.

Members of the plaintiff Commission thereupon contacted a lecture bureau responsible for scheduling Ms. Davis and arranged for her appearance in Appleton on April 28, 1976. Plaintiff Weiss thereafter made application to the School District for permission to rent the Appleton High School East gymnasium (the "gymnasium") for the evening of April 28, 1976. That application was referred to the members of the Board for their consideration at a meeting held on February 23, 1976.

Prior to the events herein involved, the Board promulgated certain written policies governing the rental of school buildings by members of the public, the relevant portions of which are as follows:

"5500 *Use of Buildings, Equipment and Personnel* It is the Policy of the Board of Education to encourage use of public school buildings by the people in the community. The Board of Education has adopted the policy of renting out all school facilities on a break-even basis due to budgetary reasons. * * * "

"5520 The following represent general guideline rules for the governance of groups granted permission to use public school facilities:

\* \* \* \* \* \*

"5522 Buildings are not to be used for religious or political activities unless the activity is non-partisan or non-denominational."

At the meeting of the Board on February 23, 1976, plaintiff Weiss stated that Ms. Davis would not be appearing as a political speaker or as a spokesperson for any political party, in compliance with § 5522. The Board nevertheless voted 3 to 2 not to allow school facilities to be rented for the proposed lecture.

At the next meeting of the Board on March 8, 1976, its members were requested to reconsider their previous decision and to permit the rental of the gymnasium for Ms. Davis' lecture which had been rescheduled to the evening of May 16, 1976. At that meeting, an attorney for the Commission was questioned by a member of the Board as to the possibility of violence or disruption at the proposed lecture. He responded by stating that to his knowledge there had not been instances of violence or disruption at any previous lecture by Ms. Davis, nor was there any indication that a disturbance might occur at the proposed lecture. No claim was made, nor was any evidence produced, that would tend to indicate that the proposed subject of the lecture would be different than that suggested by the Commission's

attorney in a written presentation made to the Board:

" * * * The subject of Ms. Davis' lecture is the rights of human beings whom she believes to have been discriminated against in the past—the rights of minorities to equal opportunities in this country, the rights of women to be free from sexual assault and the right of all persons not to be imprisoned on account of their race, their sex or their political and religious beliefs. As indicated above she will not be speaking on behalf of a political party or any candidate for a political party. Her talk is clearly non-partisan—racism and political repression are issues which concern all political parties and should concern us all as individuals. * * * " (Complaint, Exhibit "B".)

Despite these representations, the Board voted 4 to 2 to deny the Commission's request for permission to rent the gymnasium for the evening of May 16, 1976. The complaint in this action was filed four days later.

## IV.

As previously noted, the plaintiffs have consistently contended, both to the Board and this Court, that Ms. Davis' lecture will be nonpartisan and not political in nature, and that therefore the intended use of the gymnasium is not in violation of § 5522. Plaintiffs also contend (perhaps in the alternative) that facilities under the control of the members of the Board have previously been rented for purposes of a wide variety of programs, including speeches by holders of public office, candidates for public office, and other persons speaking on topics of political and social significance. In particular, plaintiffs note that in the past school facilities have been rented to the League of Women Voters which has on at least one occasion used such facilities for purposes of a "Candidates Forum."

This Court declines, however, to enter the thicket into which the plaintiffs beckon it. The issue herein involved is decidedly not whether Ms. Davis' lecture will be partisan or not, or whether past uses of school facilities by outside groups have been political in nature. Putting aside for a moment the definition of such terms as "partisan" or "political," the Court notes that it is disingenuous for the plaintiffs to contend to either the Board or this Court that Ms. Davis' lecture will not violate § 5522. That lecture shall occur in the future, and in the absence of a script to which Ms. Davis can be constrained to adhere, it is open to speculation as to just what her lecture will contain. In such circumstances, it would be absurd for this Court or for the Board—or for that matter, for the plaintiffs—to attempt to characterize and classify the substance of the proposed lecture. Indeed, to do so might well bring into play something akin to the far-reaching constitutional proscription against prior restraints. Cf. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

While this problem of prognostication is not present with respect to past speeches and meetings, and once again putting definitional problems aside, the fact remains that the record contains no evidence of the substance of the activities which have transpired in the past in rented school facilities.

The plaintiffs correctly anticipate that were this Court to find meaningful the distinction defendants draw between "political" and "nonpartisan" or "religious" and "nondenominational," evidence of past practice belying consistent adherence to these distinctions might well be relevant to a resolution of the plaintiffs' claim. However, since the Court has concluded that the distinctions the defendants have drawn in § 5522 are in themselves impermissible, it is not necessary to make inquiry into the substance of past rental usage of school facilities.

The distinctions drawn by § 5522 are impermissible because they have the effect of regulating speech on the basis of its content, and this state officials may not do. The inescapable fact is that § 5522 allows the rental of

school facilities for purposes of certain kinds of expression, but bars the rental of such facilities for other kinds of expression. If the First Amendment means anything, it means that Government shall not look to subject matter in regulating expression.

■ To be sure, reasonable regulation of the time, place, and manner of speaking is permissible. But plaintiffs here do not seek to make such use of the gymnasium as might interfere with other scheduled activities, nor is there any contention that the manner in which they seek to use the facilities is in any way unusual. Plaintiffs seek to use the facility at night when its use for school activities is not needed, no other group is scheduled to use the facility on the date in question, and the format of a public lecture is undoubtedly one that has been used previously. Thus, the only criteria upon which the plaintiffs are excluded is that of the anticipated subject matter of the lecture they seek to present.

In an analogous situation, the Supreme Court has recently ruled that regulation of speech on the basis of subject matter is violative of the equal protection clause of the Fourteenth Amendment. In *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), a city ordinance prohibited all picketing within 150 feet of a school except for peaceful picketing of any school involved in a labor dispute. In holding that this ordinance made a constitutionally impermissible distinction between labor picketing and other peaceful picketing, the Court observed at page 96, 92 S.Ct. at 2290, 33 L.Ed.2d at 217:

"Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone."

It must be emphasized that this is not a situation where state officials have nondiscriminatorily limited the use to which public property may be put. Cf. *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). To the contrary, the defendants have here committed themselves to a policy of encouraging the use of public school buildings by the people in the community. In such circumstances, it has long been recognized and is beyond peradventure that the principles most recently articulated in *Mosley* are as applicable to the rental use of school facilities by outside groups as they are to picketing alongside the school building:

"The state is under no duty to make school buildings available for public meetings. * * * If it elects to do so, however, it cannot arbitrarily prevent any members of the public from holding such meetings. * * *

\* \* \* \* \* \*

"The convictions or affiliations of one who requests the use of a school building as a forum is of no more concern to the school administrators than to a superintendent of parks or streets if the forum is the green or the market place. The ancient right to free speech in public parks and streets cannot be made conditional upon the permission of a public official, if that permission is used as an 'instrument of arbitrary suppression of free expression.' *Hague v. CIO*, 307 U.S. 496, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423; *In re Porterfield*, Cal.Sup. [28 Cal.2d 91], 168 P.2d 706. It is true that the

state need not open the doors of a school building as a forum and may at any time choose to close them. Once it opens the doors, however, it cannot demand tickets of admission in the form of convictions and affiliations that it deems acceptable. Censorship of those who would use the school building as a forum cannot be rationalized by reference to its setting. School desks and blackboards, like trees or street lights, are but the trappings of the forum; what imports is the meeting of minds and not the meeting place.

"The very purpose of a forum is the interchange of ideas, and that purpose cannot be frustrated by a censorship that would label certain convictions and affiliations suspect, denying the privilege of assembly to those who held them, but granting it to those whose convictions and affiliations happened to be acceptable and in effect amplifying their privilege by making it a special one. In the competitive struggle of ideas for acceptance they would have a great strategic advantage in making themselves known and heard in a forum where the competition had been diminished by censorship, and their very freedom would intensify the suppression of those condemned to silence. It is not for the state to control the influence of a public forum by censoring the ideas, the proponents, or the audience; if it could, that freedom which is the life of democratic assembly would be stilled. * * * " *Danskin v. San Diego Unified School Dist.,* 28 Cal.2d 536, 171 P.2d 885, 891–893 (1946).

Accord, *East Meadow Community Concerts Assn. v. Board of Education,* 18 N.Y.2d 129, 272 N.Y.S.2d 341, 219 N.E.2d 172 (1966). See also *Bynum v. Schiro,* 219 F.Supp. 204, 210 (E.D.La.1963), affirmed per curiam 375 U.S. 395, 84 S.Ct. 452, 11 L.Ed.2d 412 (1964): "A municipality cannot deny the use of a public building to one organization while 'permission is freely granted to others * * applying, [for the use of the building]

* * * for the purpose of public assembly and discussion.' "; *United States Servicemen's Fund v. Shands,* 440 F.2d 44, 46 (4th Cir. 1971): "It is much too late in the history of the First Amendment to seriously suggest that public officials managing a public facility may pick and choose the philosophical and ideological content of programs using public auditoriums."

From the statements of counsel for the defendants at the hearing held on March 24, 1976, it can be inferred that defendants seek to avoid the thrust of the foregoing legal principles by invoking the protection of *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), and the recently decided case of *Greer v. Spock,* —— U.S. ——, 96 S.Ct. 1211, 47 L.Ed.2d 505, 44 U.S.L.W. 4381 (1976). Each of these two cases can be read as supporting the argument that government officials may draw a distinction between political speech and other kinds of speech without running afoul of constitutional proscriptions. In the Court's opinion, however, each is distinguishable on its facts. We are not here confronted with the problem of a "captive audience" which was present in *Lehman* where a political candidate sought to purchase advertising space on city buses, nor the particular *sui generis* problems presented in *Greer* where First Amendment freedoms were considered in the context of a military base. Common sense would indicate that the principles enunciated in these cases are to be extended no further than their facts require, for to do so would be to undermine, if not overrule, the well developed standards applicable to less peculiar factual settings. This Court will not infer such a severe and drastic repudiation of past precedent from such indirect authority. In the absence of an explicit abandonment of venerable First and Fourteenth Amendment principles, the Court concludes that *Mosley,* and not *Lehman* or *Greer,* is controlling in this case.

The Court is buttressed in this conclusion by the fact that the discrimination

against political speech embodied in § 5522 is a perverse one at best and an invidious form of censorship at its worst. It has often been stated that the essence of the First Amendment is the protection of political speech. See A. Meiklejohn, Political Freedom: The Constitutional Powers of the People (1948). If that be so, it is a strange policy indeed which exalts nonpartisan speech over political speech. Arguably, such an inversion of values ill serves the public upon whom falls the serious and challenging business of self-government.

█ Moreover, the very terms "political" or "nonpartisan" are themselves insusceptible of principled application. Far too frequently the mantle of nonpartisanship is thrown over the shoulders of those who have been successful in obtaining political and economic power in our society, while the pejorative of "political" is reserved for those who have been less successful in those same endeavors. More obliquely (although no less perniciously), the appellation of nonpartisan is often affixed to ideas and values whose very emptiness of political content may itself be considered an expression of political position. What is "political" and what is "nonpartisan" must of necessity—as must beauty—lie in the eyes of the beholder. For that very reason, the Constitution will not allow such determinations to be made by government officials.

The foregoing thoughts have previously been eloquently expressed by Judge J. Skelly Wright in *Business Executives' Move for Vietnam Peace v. Federal Communications Commission,* 146 U.S. App.D.C. 181, 450 F.2d 642 (1971). In that case, the policy of certain broadcasters was to eschew paid advertisements dealing with "controversial" public issues. Although Judge Wright's decision on the merits was ultimately reversed, see *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), his artful analysis of the problem which is presented by such a system of

classification remains relevant to the issues presented by the facts of this case:

"No doubt a discrimination against all controversial speech—such as we face in these cases—is somewhat less 'odious' than a discrimination among different controversial viewpoints on particular issues. But it is a form of censorship just the same. It is a favoritism toward the *status quo* and public apathy and, in these cases, a favoritism toward bland commercialism. Such favoritism flies in the face of the First Amendment, whose central purpose is to protect and promote controversy, 'uninhibited, robust and wide-open,' on public issues.

"Moreover, it is by no means clear that a broadcasters' ban on 'controversial' advertising does not impermissibly open the door to a *sub rosa* discrimination *among* controversial ideas. The term 'controversial' is extraordinarily vague. Some advertisements may not be deemed 'controversial'—and may not even be 'controversial' for purposes of the fairness doctrine—but may still express ideas, the negative of which would surely be labeled 'controversial.' Ads for Radio Free Europe or Army recruiting, for example, may be allowed unanswered on the air, while ads calling the notion of the 'free world' a sham or ads calling the Army a threat to democracy would be banned entirely. The line between ideological and nonideological presentations is an almost impossible one to draw. All too often in our society one particular ideology—that of passivity, acceptance of things as they are, and exhaltation of commercial values—is simply taken for granted, assumed to be a nonideology, and allowed to choke out all the rest." 450 F.2d 642, 661.

### V.

██ In light of the foregoing analysis of the legal standards to be followed in this area, and applying those standards to the facts which this Court has found to exist for purposes of deciding

the plaintiffs' motion for a preliminary injunction, the Court must conclude that at least some of the plaintiffs are likely to prevail against some of the defendants at the trial on the merits. Since the infringement of First Amendment rights *per se* constitutes irreparable injury, *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and since the defendants have not demonstrated that any substantial harm will result to their interests or to the public's interest if interlocutory relief is ordered, the Court deems it fit and proper to grant the plaintiffs' motion for a preliminary injunction against the individual defendants.

IT IS THEREFORE ORDERED that defendants Mabel McClanahan, Karl Becker, John O'Connell, Kenneth Gibson, Kenneth Sager, Eugene Lillge, Paul Heid, and Orlyn Zieman, their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them are hereby enjoined to grant the plaintiffs Lawrence University Bicentennial Commission, Gary Weiss, and Sharon Maquita Moody permission to rent the Appleton High School East gymnasium on the evening of May 16, 1976, for purposes of a public lecture by Angela Davis.

IT IS FURTHER ORDERED that said defendants shall permit said plaintiffs to use said facilities at said time in the same manner as said facilities have been used in the past by other groups, including the provision of such custodial and other supportive services as may reasonably be necessary.