**MISSION TRACE INVESTMENTS, LTD., a Colorado limited partnership, Plaintiff,**

v.

**The SMALL BUSINESS ADMINISTRATION, an agency of the United States Government; and James C. Sanders, Administrator, Defendants.**

Civ. A. No. 83-C-1982.

United States District Court, D. Colorado.

Nov. 12, 1985.

Brian Magoon, Steven Lass, Englewood, Colo., for plaintiff.

Colleen Conlin, Asst. U.S. Atty., for defendants.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

Plaintiff Mission Trace Investments, Ltd., (Mission) filed a complaint for damages and declaratory relief against the defendants Small Business Administration (SBA) and James C. Sanders, SBA Administrator. The complaint alleged that the SBA wrongfully had denied Mission's application for a loan guarantee, and asserted two primary grounds for relief: (1) that promissory estoppel precluded the SBA from denying the loan application, and (2)

that an SBA regulation known as the "opinion molder rule" found in 13 C.F.R. § 120.2(d)(4) (1985) is unconstitutional. It was on this regulation that the SBA relied in denying Mission's application.

Mission filed a motion for partial summary judgment based on its assertion that the opinion molder rule is unconstitutional. That is the matter presently before me.

On April 8, 1985, I held a trial to the court on Mission's promissory estoppel claim and heard additional evidence and oral argument relevant to Mission's motion for partial summary judgment. At that time I denied the promissory estoppel claim because Mission could not demonstrate that it had justifiably relied on SBA representations regarding its loan application. Only Mission's constitutional claims remain. The parties have briefed the issues thoroughly and further argument would not assist in resolving them. Jurisdiction is based on 15 U.S.C. § 634(b)(1) (1982).

## I. BACKGROUND.

Investors formed Mission in 1982 to operate a dinner theatre in the Mission Trace Shopping Center in Lakewood, Colorado. On October 27, 1982, Mission leased commercial property from Pride, a Colorado partnership. Pursuant to the lease agreement, Mission deposited $49,000 with Pride and agreed to pay an additional amount not less than $1,100,000 for tenant improvements on or before January 15, 1983. That due date was extended to February 15, 1983. On February 18, 1983, Mission paid Pride an additional $50,000 to further extend the payment due date to May 15, 1983.

In April 1983, Margaret S. McCool, Mission's representative, met with Warner Knobe, president of Columbine Valley Bank and Trust (Columbine), to inquire about a loan for Mission. Knobe determined that Mission was not eligible for a loan directly from Columbine without outside assistance. Knobe suggested an SBA guaranteed loan and provided McCool with an SBA loan guarantee application form. On May 25, 1983, Pride extended Mission's payment due date again, this time until

June 7, 1983. In late May or early June, 1983, McCool completed the SBA application and returned it to Knobe. On June 7, 1983, McCool met with Pride to discuss a further extension of Mission's lease. By June 10, 1983, Knobe had delivered Mission's application to the SBA. Knobe discussed Mission's eligibility with an SBA official on June 9 or 10, 1983. On June 10, 1983, Knobe talked to Mission's attorney, Brian Fitzgerald, about his conversation with the SBA. That same day, Fitzgerald telephoned McCool, and Mission paid an additional $50,000 for another lease extension.

On July 22, 1983, the SBA District Director approved Mission's creditworthiness, but final approval remained subject to an eligibility determination based on noneconomic factors. Apparently, by the latter date SBA officers had become concerned about whether Mission's planned dinner theatre would violate the "opinion molder" rule.

The opinion molder rule, is set out in the regulations at 13 C.F.R. § 120.2(d)(4) (1985), and provides,

"Financial assistance will not be granted by SBA ... [i]f the applicant is engaged in the creation, origination, expression, dissemination, propagation, or distribution of ideas, values, thoughts, opinions or similar intellectual property, regardless of medium, form or content. Financial assistance to such applicants is barred in order to avoid Government interference, or the appearance thereof, with the constitutionally protected freedoms of speech and press."

Pride sent Mission a default letter on July 28, 1983. On August 12, 1983, the SBA determined that Mission was not eligible for a loan guarantee. The SBA has stipulated that the opinion molder rule was the sole basis for denying Mission's application, and that absent that rule, Mission would have qualified for and received an SBA loan guarantee.

Although the rule purports to prevent SBA support of all businesses engaged in creating or expressing ideas "regardless of medium, form or content," it provides for several exceptions to the general ban on SBA assistance. Commercial printers, advertisement publishers, advertising firms, broadcasting and cable television operators, nonacademic schools, and general book and music distributors are all expressly excepted from the rule, and thus are eligible for SBA loans and loan guarantees.[1]

A word of background about the SBA will facilitate understanding the issue presented. Congress created the SBA to assist small businesses as a means of strengthening the national economy. SBA's primary policy goals were declared by Congress:

"The essence of the American economic system of private enterprise is free competition. Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts of subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and

---

1. 13 C.F.R. § 120.2(d)(4)(i)-(vii).

strengthen the overall economy of the Nation." 15 U.S.C. § 631(a) (1982).

Plaintiff, in effect, is contending that the "opinion molder rule" requires the SBA, an agency charged with fostering a stronger economic system by encouraging and assisting small businesses, to deny benefits to many lawful, viable small businesses for reasons totally unrelated to their economic soundness. In response, the SBA has asserted three reasons in defense of its "opinion molder rule." *First,* that the agency seeks to avoid governmental entanglement with particular political views or propaganda. *Second,* that the rule merely attempts to avoid the possibility of unconstitutional "prior restraints" that could occur if applicants should seek to improve their chances of receiving financial assistance by tailoring the content of their speech to please the SBA administrators. *Third,* that "SBA wishes to avoid lending to concerns which publish or produce or sell materials of a highly controversial nature which, while not illegal, may not be in the public interest to promote."[2] In his testimony, Charles R. Hertzberg, SBA Deputy Associate Administrator for Financial Assistance, gave several examples of the types of speech the SBA views as contrary to the public interest. These included sexually explicit material and racial supremacy literature. Thus, it appears that the opinion molder rule is aimed at preventing government financing of "offensive" speech.[3]

Mission claims that the opinion molder rule unconstitutionally inhibits its First Amendment rights by depriving its otherwise eligible business of benefits merely because it exercises its right to freedom of expression. The SBA has responded that the regulation does not prohibit any expression and, in fact, it serves important governmental interests.

## II. MISSION'S FIRST AMENDMENT RIGHTS.

■ The First Amendment's declaration that "Congress shall make no law ... abridging the freedom of speech" clearly prohibits any agency of the government from banning lawful expression in whatever form. Nevertheless, a decision to grant or withhold governmental benefits to parties who engage in protected speech presents complex issues. On the one hand, the government may not deny benefits to a party merely because it exercises its constitutionally protected right to free speech. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). On the other hand, a decision *not to subsidize* the exercise of a right generally is held not to violate that right. *Regan v. Taxation With Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Cammarano v. United States,* 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959).

Consequently, the threshold question is whether Mission can rely on the First Amendment's protection in challenging the opinion molder rule. Does the SBA practice of providing loan guarantees to all qualified businesses, except those that engage in particular types of constitutionally protected expression, abridge freedom of speech?

In *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) the Court considered the constitutionality of a statute exempting veterans from property taxes. Under the statute, veterans could not receive the exemption unless they signed a pledge promising not to advocate forcible overthrow of the government. Declaring the statute an unconstitutional burden on freedom of speech, the Court reasoned,

"To deny an exemption to claimants who engage in certain forms of speech is in

---

**2.** *Hearing on S. 2084 Before the Senate Comm. on Small Business,* 98th Cong., 2d Sess. 98–823 (1981) (statement by James C. Sanders, Administrator SBA).

**3.** *See also Hearing Before the Subcommittee on SBA oversight and Minority Enterprise of the House Comm. on Small Business,* 94th Cong., 1st Sess. 84 (1975) (testimony of former SBA Administrator L. Laun).

effect to penalize them for such speech. Its deterrent effect is the same as if the state were to fine them for this speech. The appellees are plainly mistaken in their argument that, because a tax exemption is a 'privilege' or 'bounty,' its denial may not infringe speech.... [T]he denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech. The denial is 'frankly aimed at the suppression of dangerous ideas.'" *Id.* at 518–19, 78 S.Ct. at 1338

*Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), involved a Seventh-Day Adventist to whom South Carolina had denied unemployment benefits because she had refused to accept jobs that required her to work on Saturdays. The Court struck down the South Carolina court's construction of the unemployment compensation statute on the ground that it had denied benefits solely because the applicant had exercised her constitutional right to practice her religion. *Id.* at 404, 83 S.Ct. at 1794. The Court explained:

> "Nor may the South Carolina court's construction of the statute be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's 'right' but merely a 'privilege.' It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.*

Several cases have held that public employment, which may be denied to all on an equal footing, may not be subjected to conditions that unreasonably restrict an employee's right to free speech. *See e.g., Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 605, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967). Other decisions have declared unconstitutional laws that have required recipients of state welfare benefits to be state residents. Those restrictions have been held unconstitutional for inhibiting protected travel rights of potential benefit recipients. *See Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Graham v. Richardson,* 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971).[4]

Fourteen years after *Speiser v. Randall,* its principle was reaffirmed, albeit in dicta, in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). There the Court stated that a nontenured college faculty member could not be fired solely for exercising his constitutional right to free speech:

> "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized

---

**4.** Those cases relied in part upon the Equal Protection clause. A similar argument could be made here because the SBA loans money to some speakers, *e.g.* advertisers, but not to others, *e.g.* artists. *See Police Department of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Karst, *Equality as a Central Principle in the First Amendment,* 43 U.Chi.L.Rev. 20 (1975). Several cases in which Equal Protection analysis has been rejected are distinguishable from the instant case. The Court rejected an Equal Protection argument in *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). Certainly, a regulation that discourages free speech must be examined with greater scrutiny than one that discourages abortions. *Regan v. Taxation with Representation* also rejected an Equal Protection argument. However, there the Court relied on Congress' broad power to regulate taxation and on a much more significant risk of governmental entanglement with political speech. *See* text, *infra* at 694.

and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser v. Randall*, 357 U.S. 513, 526 [78 S.Ct. 1332, 1342]. Such interference with constitutional rights is impermissible." *Id.* at 597, 92 S.Ct. at 2697.

More recently, in *FCC v. League of Women Voters*, —— U.S. ——, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), the Supreme Court held that a federal aid-to-public-broadcasters program could not require grant recipients to abstain from presenting station editorials. The Court adopted the same First Amendment analysis it has applied in cases involving direct government restrictions on free speech and declared the aid program unconstitutional even though it employed only indirect discouragement of expression through discriminatory subsidies.

In contrast to these decisions, *Cammarano v. United States*, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), upheld a Treasury Department regulation that allowed tax deductions for business expenses but not for business lobbying expenses. The Court distinguished *Speiser v. Randall:*

"*Speiser* has no relevance to the cases before us. Petitioners are not being denied a tax deduction because they engage in constitutionally protected activities, but are simply being required to pay for those activities entirely out of their own pockets, as everyone else engaging in similar activities is required to do under the provisions of the Internal Revenue Code."[5] *Id.* at 513, 79 S.Ct. at 533.

Justice Douglas' concurring opinion clarified the *Cammarano* decision. He explained,

"If Congress had gone so far as to deny all deductions for 'ordinary and necessary business expenses' if a taxpayer spent money to promote or oppose initiative measures, then it would be placing a penalty on the exercise of First Amendment rights. That was in substance what a State did in *Speiser v. Randall*, 357 U.S. 513 [78 S.Ct. 1332]." *Id.* at 515, 79 S.Ct. at 534.

Subsequent Supreme Court application and interpretation of *Cammarano* has further clarified its holding. In *Regan v. Taxation with Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), the Court considered the constitutionality of another section of the Internal Revenue Code, 26 U.S.C. § 501(c)(3)(1982). That section prohibited taxpayers from deducting contributions to nonprofit organizations that engaged in lobbying. Under § 501(c)(4), however, nonprofit organizations seeking tax deductible contributions could create separate but affiliated lobbying organizations. Taxpayers could deduct contributions to nonlobbying § 501 (c)(3) organizations but not to affiliated § 501(c)(4) organizations. In this way, tax exempt contributions did not support lobbying. At the same time, § 501(c)(3) organizations could continue to benefit from tax deductible contributions while lobbying indirectly through their § 501(c)(4) affiliates. Once again, the Court refused to strike down the statute under the *Speiser-Perry* rule. Instead, *Cammarano* was found to be controlling. *Regan v. Taxation With Representation* declared:

"TWR [Taxation With Representation] is certainly correct when it states that we

---

5. The *Cammarano* Court's cryptic conclusion seems to distinguish between being denied a business tax deduction on the one hand and incurring a non-deductible business expense on the other. At first glance, this difference is elusive. How does the Court distinguish between the unconstitutional condition placed upon receipt of the veteran's tax exemption in *Speiser* and the constitutional regulation in *Cammarano* declaring certain constitutionally protected business expenses non-deductible? In one sense the *Cammarano* Court did not deny a business a benefit for exercising its constitution-

al right to lobby. Every business engaging in "similar activities" was required to pay its own lobbying expenses. In another sense, however, the Court seems to have denied some businesses the benefit of deducting their operating expenses where, as in *Cammarano,* those operating expenses involved protected speech. Thus, some businesses lost a government "benefit" because their enterprises fortuitously involved matters of legislative concern. Compare lobbying expenses to other public relations advertising expenses. *See infra* at note 7.

have held that the government may not deny a benefit to a person because he exercises a constitutional right. *See Perry v. Sindermann*, 408 U.S. 593, 597 [92 S.Ct. 2694, 2697, 33 L.Ed.2d 570] (1972). But TWR is just as certainly incorrect when it claims that this case fits the *Speiser-Perry* model. *The Code does not deny TWR the right to receive deductible contributions to support its nonlobbying activity, nor does it deny TWR any independent benefit on account of its intention to lobby.*" *Id.* at 545, 103 S.Ct. at 2001 (emphasis added).

The majority seemed to rely on the fact that TWR was not entirely denied its independent tax benefits for lobbying. TWR, through an eligible affiliate, could still have benefited from tax deductible contributions. Nonlobbying organizations still received tax deductible contributions. Justice Blackmun's concurring opinion, joined by Justices Brennan and Marshall, clarified the Court's position and harmonized the apparent tension between *Speiser-Perry* and *Cammarano*:

"I write separately to make clear that in my view the result under the First Amendment depends entirely upon the Court's necessary assumption—which I share—about the manner in which the Internal Revenue Service administers § 501.

If viewed in isolation, the lobbying restriction contained in § 501(c)(3) violates the principle, reaffirmed today, *ante*, at 545 [103 S.Ct. at 2001], 'that the government may not deny a benefit to a person because he exercises a constitutional right.' Section 501(c)(3) does not merely deny a subsidy for lobbying activities, see *Cammarano v. United States*, 358 U.S. 498 [79 S.Ct. 524, 3 L.Ed.2d 462] (1959); it deprives an otherwise eligible organization of its tax-exempt status and its eligibility to receive tax-deductible contributions for all its activities, whenever one of those activities is 'substantial lobbying.' Because lobbying is protected by the First Amendment, ... § 501(c)(3)

therefore denies a significant benefit to organizations choosing to exercise their constitutional rights.

The constitutional defect that would inhere in § 501(c)(3) alone is avoided by § 501(c)(4). As the Court notes, *ante*, at 544 [103 S.Ct. at 2000], TWR may use its present § 501(c)(3) organization for its nonlobbying activities and may create a § 501(c)(4) affiliate to pursue its charitable goals through lobbying." *Id.* at 552, 103 S.Ct. at 2004 (citations and footnote omitted).

*League of Women Voters*, —— U.S. —— ——, 104 S.Ct. at 3127–29 provided further clarification.[6] There the Court distinguished *Taxation With Representation* which recognized that lobbying organizations could structure themselves so as to retain tax benefits for their nonlobbying activities. In contrast, under the aid-to-public-broadcasters program, stations that editorialized forfeited *all* government funds. In the course of invalidating this scheme, the Court noted,

"Of course, if Congress were to adopt a revised version of § 399 that permitted noncommercial educational broadcasting stations to establish 'affiliate' organizations which could then use the station's facilities to editorialize with non-federal funds, such a statutory mechanism would plainly be valid under the reasoning of *Taxation With Representation*. Under such a statute, public broadcasting stations would be free, in the same way that the charitable organization in *Taxation With Representation* was free, to make known its views on matters of public importance through its non-federally funded, editorializing affiliate without losing federal grants for its non-editorializing broadcast activities." *Id.* at ——, 104 S.Ct. at 3128.

The rule that emerges from the *Speiser-Perry* line of cases and, more recently, from *Taxation With Representation* and *League of Women Voters* is that a regulation may not eliminate a benefit entirely

6. *See* text, *supra* at 691–692.

just because a party exercises a constitutionally protected right to free speech. Thus, in *Cammarano* and *Taxation With Representation*, the government had not eliminated entirely all opportunity for organizations that did some lobbying to obtain favorable tax treatment for their non-lobbying activities, and therefore, the challenged regulations were upheld. However, in *League of Women Voters*, public broadcasters seeking benefits were required to refrain from editorializing or relinquish all their government benefits.[7]

Several additional distinctions between *Cammarano* and *Taxation With Representation*, on the one hand, and the *Speiser-Perry* line of cases and *League of Women Voters*, on the other, are instructive. Unlike the *Speiser-Perry* cases, the disputed regulations in *Cammarano* and *Taxation With Representation* were not "frankly aimed at the suppression of dangerous ideas." *Speiser* 357 U.S. at 519, 78 S.Ct. at 1338. Rather, those regulations merely sought to avoid government entanglement with lobbying, a type of speech aimed directly at influencing governmental decision making.

In *League of Women Voters*, the statute banning government funds to broadcasters who aired station editorials was also designed to avoid governmental entanglement with expression. There, however, the government's interest in avoiding entanglement was not as strong as in *Cammarano* and *Taxation With Representation*. As Professor Steven Shiffrin persuasively points out in his article *Government Speech*, 27 UCLA L.Rev. 565 (1980), the

government is "entangled" with private speech in many contexts, but "departures from neutrality are indefensible when they undermine respect for the democratic process." *Id.* at 611. Thus, while governmental entanglement may be acceptable in some contexts, *e.g.* public education and FCC regulations, governmental entanglement with speech that is intended to directly influence political decisions creates a glaring conflict of interest that could quickly destroy the legitimacy of our democracy. In contrast, governmental entanglement with public broadcasters' station editorials was not considered dangerous to the legitimacy of our political process.[8]

Unlike the circumstances in *Cammarano* and *Taxation With Representation*, in *League of Women Voters*, certain safeguards inherent in the structure of the disputed grant program and the public broadcasting industry lowered the risk of governmental abuses of its speech subsidy. In particular, the Court noted that the agency responsible for awarding grants was relatively removed from the political process. Moreover, the large number and diversity of public broadcasters minimized the risk of government propaganda.[9]

In the present case, as in *League of Women Voters*, the party seeking financial assistance forfeited *all* rights to benefits solely because it planned to engage in constitutionally protected expression. Unlike the situations in *Cammarano* and *Taxation With Representation*, here Mission could not obtain an SBA loan guarantee for the non-speech aspects of its enterprise, i.e. the restaurant. Thus, because Mission

---

**7.** This method of reconciling these cases is somewhat problematic. Certainly, in one sense, the regulations in *Cammarano* and *Taxation With Representation* entirely eliminated government benefits—tax deductions—because the organizations involved engaged in lobbying. What constitutes an "entire" benefit? What constitutes an independent benefit? Again the Court has encountered conceptual difficulty in trying to distinguish between denying benefits to parties because they speak, and refusing to subsidize speakers. Accordingly, an analysis of the interests involved in these cases is appropriate.

**8.** Significantly, the appellants in *League of Women Voters* did not challenge the portion of the statute that precluded public broadcasters from endorsing political candidates. That portion of the statute would have invoked a stronger governmental interest in avoiding entanglement because selection of political candidates, like lobbying, is a more integral part of governmental decision making.

**9.** *See* Shiffrin *supra* at 644 where he explains that structural protections and diverse decision makers can help prevent grant decisions from becoming politicized.

planned to engage in protected artistic expression, the SBA completely denied it all the benefits to which it was admittedly otherwise entitled.

In addition, as in *Speiser*, the regulation here is "frankly aimed at the suppression of dangerous ideas." One purpose of the opinion molder rule is to avoid government sponsorship of speech that, in the SBA's view, is not in the public interest. Thus, the SBA denies benefits to particular businesses because it perceives that the constitutionally protected activity of those businesses injures the public.

Here, as in *League of Women Voters*, the government's interest in avoiding propagandistic entanglement with expression is weak.[10] Three factors establish this proposition.

First, the federal government's present "entanglement" with artistic expression demonstrates that its interest in avoiding this "problem" is not significant. Congress has declared "that the encouragement and support of national progress and scholarship in the humanities and the arts, while primarily a matter for private and local initiative, is also an appropriate matter of concern to the Federal Government." 20 U.S.C. § 951(1) (1982). Towards that end, Congress has established the National Endowment for the Arts. 20 U.S.C. § 954 (1982).

Moreover, the government, through the FCC, is entangled with the artistic expression disseminated through the public airwaves. In addition, the government allows tax deductions to nonprofit organizations that engage in artistic expression. Con-trast *Cammarano* and *Taxation With Representation*. Thus, the government regulates and subsidizes artistic expression; its interest in avoiding entanglement with art could not be substantial.

Second, the government's interest in avoiding entanglement with artistic expression is less significant than its interest in avoiding entanglement with other forms of expression more directly concerned with influencing the political process. In *Cammarano* and *Taxation With Representation* the government's interest in avoiding political entanglement arose from its concern for the fairness and integrity of our participatory political process. Although artistic expression can be political, typically, it is not directly aimed at influencing government decisions. Rather, art appeals to the public's hearts and minds which, in turn, shape the political process. Artistic expression is relatively removed from political decisions, and therefore, it presents a lower risk of political entanglement. Certainly, artistic expression presents a lower risk of political entanglement than the editorial expression of public broadcasters so jealously guarded in *League of Women Voters*.

Third, structural safeguards similar to those present in *League of Women Voters* protect small businesses from becoming conduits of coercive political propaganda. The SBA is an administrative agency organized into regional offices.[11] Its decisions are controlled primarily by purely economic criteria. The principle goal of the SBA is not related to freedom of expression. The SBA exists to promote small businesses.

---

**10.** The process of balancing interests to determine whether the First Amendment applies to certain speech may seem inconsistent with the "absolutist" approach of striking down all regulations aimed at the content or communicative impact of speech. *See generally* L. Tribe, *American Constitutional Law* 580–88 (1978). However, either implicitly or explicitly, the Supreme Court has consistently balanced interests to define what expression falls into a category of "absolutely" protected speech. This approach has been called "definitional balancing." Nimmer, *The Right to Speak from Times to Time,* 56 Calif.L.Rev. 935, 942 (1968); Shiffrin, *Defam-*

*atory Non-Media Speech and First Amendment Methodology,* 25 UCLA L.Rev. 915, 958–61 (1978). Thus, in the present case, it is appropriate to weigh the government's interests as a method of deciding the threshold question of whether the First Amendment protects Mission's expression.

**11.** The SBA is an "executive" agency administered by the President but funded by Congress. Our constitutional system of checks and balances therefore further serves to check potential SBA abuses.

The non-economic criteria the SBA uses are determined by the SBA's Loan Policy Board. 15 U.S.C. § 633(d)(1982). The Board consists of the SBA Administrator, the Secretary of Commerce, and the Secretary of the Treasury. Thus, policy-making power is diffused to several agency administrators.

Dinner theatre "editorial" decisions regarding what plays to produce and how to produce them are dispersed to a very large number of speakers each with a relatively small voice. Moreover, once the SBA has guaranteed a loan it cannot withdraw that guarantee because of its assessment of a small business' public worth. *See* 13 C.F.R. § 122.23 *et seq.* (1985). Thus, the government's interest in avoiding entanglement is weak. Conversely, as this opinion will demonstrate, this nation's commitment to artistic expression is very strong.

To summarize, the opinion molder rule completely deprives otherwise qualified applicants of *all* their potential SBA benefits solely because they engage in constitutionally protected activity. *League of Women Voters, Taxation With Representation.* One of the regulation's purposes is "frankly aimed at the suppression of dangerous ideas." *Speiser, Perry.* Unlike *Cammarano* and *Taxation With Representation,* the government's interest in avoiding political entanglement is relatively weak, while the interests in artistic expression are strong. *See League of Women Voters.* Accordingly, I conclude that the opinion molder rule inhibits Mission's right to freedom of speech, and therefore, invokes a First Amendment challenge.

The inquiry, however, does not end here. The Supreme Court has upheld many laws and regulations that indirectly inhibited speech but which were not aimed at abridging the content of the speech. *Greer v. Spock,* 424 U.S. 828, 839, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505 (1976) (no First Amendment right to have candidates speak on military base); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (upheld ordinance banning noisy demonstrations near schools);

*United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (upheld law forbidding symbolic draft-card burning); *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (prohibitions against loudspeakers in residential areas are constitutional).

The SBA contends that the opinion molder rule is "content-neutral" because it forbids governmental subsidy of all speech regardless of its content. Thus, the next issue becomes: Is the opinion molder rule aimed at inhibiting some types of speech because of the *content* of that speech?

## III. CONTENT-BASED RESTRAINT ON EXPRESSION.

■ The Constitution does not tolerate content-based discrimination against protected speech. *See Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); L. Tribe, *American Constitutional Law* 584–88 (1978). As the Supreme Court proclaimed in *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972), "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."

■ This first maxim of the First Amendment means that the government may not justify restrictions on free speech by relying on the adverse effect on the public of the speech's "communicative impact." *See United States v. O'Brien,* 391 U.S. at 377, 382, 88 S.Ct. at 1679, 1681; L. Tribe, *supra* at 580–88. Thus, although the government may have legitimate interests in controlling the non-communicative aspects of a medium, the First Amendment precludes similar interests in controlling the communicative impact of expression. *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 502, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981).

The First Amendment's prohibition on content discrimination extends to the elimination of entire discussion topics. *Consolidated Edison Co. v. Public Serv.*

*Comm'n,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), held that a regulation could not prohibit a power company from discussing controversial issues in monthly billing inserts. Proponents of the regulation argued that it was content-neutral because it banned both sides of controversial discussions and that it was a legitimate time, place and manner restriction on one medium of expression—billing inserts. The Court rejected both these positions stating, "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Id.* at 537, 100 S.Ct. at 2333.

In *League of Women Voters,* the Supreme Court struck down as unconstitutional a statute that allowed federal funding only to broadcasters who did not air station editorials. Even though the statute restricted *all* station editorials, regardless of their content, the Court rejected the argument that the statute was content neutral. The Court explained that a regulation denying funds to one group of persons who wished to address selected audiences violated the First Amendment by restricting important topics of public discussion. *Id.* —— U.S. at ——, 104 S.Ct. at 3118 (quoting *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. at 546, 100 S.Ct. at 2338).

Here, the opinion molder rule discriminates against expression because of the content of that expression. The SBA promulgated the opinion molder rule because it feared that the communicative impact of certain expression would offend the public interest. Specifically, the SBA was concerned that subsidized political speech would create a governmental conflict of interest and that government sponsorship of "offensive" speech would not promote the public welfare. Clearly, the opinion molder rule is an attempt to protect the public from the communicative impact or content of certain speech. As *Consolidated Edison* and *League of Women Voters* demonstrate, the opinion molder rule is no less offensive to the First Amendment because it restrains entire topics of public discussion.

Application of the opinion molder rule requires the SBA to examine the content of a loan applicant's speech. Advertisement companies are eligible for SBA benefits, so SBA administrators must examine the content of an applicant's speech to determine whether it is commercial advertising or some other, more controversial, form of protected expression that might render the applicant ineligible. General bookstores are eligible but "theme" bookstores are not. Similarly, entertainment centers are eligible, but dinner theatres cannot receive benefits. Thus, the SBA must examine the content of the books a store sells or the entertainment an establishment offers to determine the applicant organization's eligibility.

Several cases and commentators have suggested that courts should not ask whether a statute or regulation discriminates based on content, but rather whether it discriminates against certain viewpoints.[12] Justices Stevens and Rehnquist, dissenting in *League of Women Voters,* suggested that a regulation could restrain an entire type of expression so long as it did not single out any particular viewpoint for discrimination. Despite plain language in the *Consolidated Edison* opinion to the contrary, Justices Stevens and Rehnquist argued that the regulation that banned billing inserts was unconstitutional solely because it constituted hidden viewpoint discrimination against the only party employing billing inserts to express its views. But *Consolidated Edison* was solidly grounded on the principle that any attempt to limit the topics of public discussion, or to inhibit important media of public expression restricts free speech and violates the First Amendment. I agree with that prin-

---

12. *See League of Women Voters,* —— U.S. at ——, 104 S.Ct. at 3132 (Justice Stevens dissenting); Farber, *Content Regulation and the First Amend-* ment: *A Revisionist View,* 68 Geo.L.J. 727 (1980); Redish, *The Value of Free Speech,* 130 U.Pa.L.Rev. 591 (1982).

ciple. Anyone who has chaired a committee meeting knows that a person with power to set the agenda, and thus limit the issues for debate, can significantly encourage some views while suppressing others.

Arguably, the majority in *League of Women Voters* bowed briefly to the lexicon of "viewpoint" discrimination when it suggested that public broadcasters, as a group, present an important editorial viewpoint. *Id.* —— U.S. at ——, 104 S.Ct. at 3116. However, the thrust of the majority's argument was not that public broadcasters represent a particular homogeneous viewpoint, but rather that editorial commentary represents a vital mode of public expression. Consequently, a statute that inhibits all the viewpoints of a heterogeneous group of speakers in an important forum of public communication violates the First Amendment.

Although the First Amendment protects more than discrimination against viewpoints, certainly viewpoint discrimination presents a particularly offensive restriction on freedom of speech. Ostensibly content-neutral regulations that restrain all views expressed in certain ways or both sides of a public debate can constitute hidden viewpoint discrimination.

In *Thornhill v. Alabama*, 310 U.S. 88, 104, 60 S.Ct. 736, 745, 84 L.Ed. 1093 (1940), the Court, in overturning a statute that prohibited labor picketing, declared: "The safeguarding of these *means* is essential to the securing of an informed and educated public opinion...." (Emphasis added). Even though other methods of communicating their grievances were available to the employees, the Court upheld their right to picket because it provided the best vehicle for presenting their particular views. *See also Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (invalidating a statute that punished people who expressed their opposition to the government by displaying flags).

*Martin v. Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), struck down an ordinance banning door-to-door distribution of handbills. The Court emphasized that, in effect, the law discriminated against certain viewpoints: "Door to door distribution of circulars is essential to the poorly financed causes of little people." *Id.* at 146, 63 S.Ct. at 865.

Similarly, in *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), the Court declared unconstitutional an ordinance prohibiting leafleting. There the Court reasoned that leafleting was an important method of communicating public opinion. Thus, restricting a particular medium of communication can deprive certain groups of their only means of public expression, thereby removing their viewpoints from the marketplace of ideas. But perhaps a more important theme running through these cases suggests that restricting important media of public discussion and expression violates the First Amendment.

The opinion molder rule clearly restrains important media of public expression, *e.g.*, art and editorial commentary. *See League of Women Voters*. It also discriminates against particular viewpoints.

Moreover, the opinion molder rule allows the SBA to grant benefits to commercial advertisers. Ironically, advertisers are perhaps the quintessential opinion molders; they are full time, professional opinion molders. All of us, whether conservative, liberal or radical ought to share a concern for the values of our American culture now that our society is apparently committed to round-the-clock professional commercial manipulation of its citizens by paid advertising.[13] Clearly an advertiser is hawking a particular viewpoint. As one commentator has explained,

"Certainly the inputs promoting materialism in American culture are quite strong. Living in a society in which children and adults are daily confronted with multiple communications that ask them to purchase products inevitably places

---

**13.** *See* Shiffrin, *The First Amendment and Economic Regulation: Away from a General Theory of the First Amendment,* 78 Nw.U.L.Rev. 1212, 1280 (1983), and references therein.

emphasis on materialistic values. The authors of the individual messages may not intend that general emphasis, but the whole is greater than the sum of the parts. Even if it were not, the parts add up to a loud materialist chorus.

"Moreover, the promoters of the materialist message benefit from an almost classic case of market failure. Advertisers spend some sixty billion dollars per year to disseminate their messages. Those who would oppose the materialist message must combat forces that have a massive economic advantage. Any confidence that we will know what is truth by seeing what emerges from such combat is ill placed. The inequality of inputs is structurally based."[14]

Advertisers not only espouse a materialistic viewpoint, they also deaden society to arguably more important ideas. Constantly barraged by commercial information, we may seek to escape by "tuning-out" all messages. In this way we may miss stimulating political, philosophical, and artistic expression. With senses overloaded to the point of nausea by information about the special features of this years cars and the benefits of one cleanser over another, it may become more difficult to tune in on a political candidate's stand on an issue or to notice a beautiful mural or sculpture.

The SBA's practice of exalting commercial over noncommercial speech favors a particular viewpoint, materialism, while inhibiting the expression of other, contrary viewpoints. The First Amendment does not permit this favoritism. As the Supreme Court pointed out in *Metromedia,*

*Inc. v. San Diego,* 453 U.S. at 513, 101 S.Ct. at 2895, "[T]he [government] may not conclude that the communication of commercial information … is of greater value than the communication of noncommercial messages."[15]

As previously set forth, one purpose of the opinion molder rule is to avoid governmental sponsorship of views that the SBA considers to be outside the public interest. The SBA's purpose may appear acceptable to some in the context of racial supermacy literature or sexually explicit material, but it might seem less tolerable if the SBA deemed civil rights literature or D.H. Lawrence novels to be outside the "public interest." "[O]ne man's vulgarity is another's lyric." *Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). In *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943), the Court proclaimed, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion or other matters of opinion." Consequently, the SBA's paternalistic protection of the "public interest," embodied in its prohibition against loans to businesses because some of them might engage in certain types of "offensive" speech, is intolerable viewpoint discrimination.[16]

As *Thornhill v. Alabama* and *Martin v. Struthers* suggested, one variety of viewpoint discrimination can also occur when a regulation inhibits the best means of expressing certain ideas or the only effective methods for certain individuals to express

---

**14.** *Id.* at 1281.

**15.** The Court cited *John Donnelly & Sons v. Campbell,* 639 F.2d 6, 15–16 (1st Cir.1980), where the Court of Appeals stated, "The law thus impacts more heavily on ideological than on commercial speech—a peculiar inversion of First Amendment values."

**16.** The discretionary application of the opinion molder rule also invites viewpoint discrimination. General bookstores may receive SBA benefits but theme bookstores are ineligible. Similarly, entertainment centers are eligible, but not theme movie houses or dinner theatres. The distinction between a general selection of books or movies and a thematic selection requires the SBA to identify "themes" which, in turn, may require viewpoint discrimination. Apparently, if a bookstore's selection of Marxist literature grew too large, it would not be eligible for SBA benefits. However, Marxists would certainly argue that "general" bookstores espouse an individualistic, capitalistic theme. Would SBA determinations of what constitutes a general bookstore be the same if a store's selection favored romantic novels? how-to books? sexually explicit literature? socialist works? libertarian works?

themselves. By inhibiting artistic expression, the opinion molder rule discourages certain ideas which are best expressed through artistic media. Art stretches our understanding of feelings and ideas in ways which frequently cannot be put into words. Many of art's expressive benefits can be communicated only through art. For artists, as for the public broadcasters in *League of Women Voters*, it is difficult, if not impossible, to identify a homogeneous group of speakers whose collective viewpoint could be discouraged. Nonetheless, restraints on artistic speech inhibit the viewpoints of all those talented enough to express their ideas or feelings artistically. The opinion molder rule thereby inhibits an essential medium of public expression. Such a rule compels a businessman-artist who lacks funds from other sources, and who is faced with a choice between two equally viable small businesses, to choose widget production over theatrical production. The First Amendment does not allow the SBA to compel such a choice.

I conclude that the opinion molder rule inhibits important media of public expression because of the content or viewpoints of the messages expressed. Typically, such a conclusion would automatically warrant strict scrutiny of the regulation. Applying such a rigorous standard, I could strike down the opinion molder rule.[17]

The opinion molder rule is both over and underinclusive. It renders ineligible many otherwise qualified businesses that engage in completely innocuous forms of expression. Dinner theatres, which typically revive popular musicals and comedies, and seldom engage in anything currently controversial, may be one of the best examples of this overinclusiveness. Conversely, the regulation does not prohibit loans to advertising firms whose clients include political candidates and governmental agencies.[18]

Moreover, the SBA lends money to businesses that significantly influence public opinion without directly engaging in protected First Amendment activity.

The opinion molder rule offers many examples of over and underinclusiveness. However, the interests involved in the present case call for a finer instrument than strict scrutiny. In a sense, the opinion molder rule was designed to protect speech by eliminating all potentially coercive governmental influence on speakers. (Nonetheless, failure to grant benefits to certain speakers has coercive effects of its own.) Unlike the situation in many cases, here both sides can legitimately assert speech-protective interests. When faced with legitimate competing interests, the Supreme Court has balanced the interests in free expression against the government's desire to restrict expression. *See, e.g., League of Women Voters; Metromedia, Inc. v. San Diego*, 453 U.S. 490, 101 S.Ct. 2882; *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Thus, I must consider whether the SBA's interest in denying benefits to businesses that engage in artistic expression outweigh Mission's First Amendment rights.

## IV. THE COMPETING INTERESTS.

### A. The SBA's Interests.

The SBA does not have a legitimate interest in preventing government sponsorship of speech that it views as offensive to the public welfare. In *Southeastern Promotions, Ltd, v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), a group sought to use a municipally owned theatre to perform "Hair." The Court held that local officials could not limit access to the theatre based on their views of what productions promoted the public interest.

---

**17.** To my knowledge only one statute or regulation has ever withstood strict scrutiny. *See Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

**18.** The television program "60 Minutes" recently rebroadcast a story about Barbara Proctor, a woman who started her own advertising agency. She refused to handle certain clients because she found their political views objectionable. She began her business with an SBA loan. Broadcast in Denver, Colorado at 6:00 p.m., June 23, 1985.

The SBA has also asserted that the opinion molder rule is necessary to avoid prior restraints on speakers seeking governmental support. In creating the SBA, Congress directed the SBA's Loan Policy Board to "establish general policies (particularly with reference to the public interest involved in the granting and denial of applications for financial assistance . . .), which shall govern the granting and denial of applications for financial assistance by the Administration." 15 U.S.C. § 633(d)(1982). In a sense, therefore, the SBA is required to distinguish between businesses that it believes promote the public interest and those it believes do not. The SBA argues that without the opinion molder rule, it would be forced to review each applicant's proposed speech to determine whether the speech will be in the public interest. This pre-publication review, argues the SBA, would constitute an unlawful prior restraint.

The SBA's financial assistance program, without the opinion molder rule, would not necessarily present a system of prior restraints. The SBA's financial assistance to qualified businesses does not prohibit any speech. It does not, therefore, constitute a pre-publication prohibition on speech. Compare *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Rather, advocates of the opinion molder rule appear concerned with the SBA assistance program's potentially coercive effect.

The opinion molder rule's coercive effect, however, discourages much more constitutionally protected expression than it protects. Small businesses seeking assistance must abandon virtually *all* their expressive activities. To qualify for SBA benefits, a dinner theatre must change to a more traditional restaurant; a bookstore inclined to specialize in Black American literature must become a "general" bookstore; an art gallery must become a card shop.

Insofar as the opinion molder rule prevents governmental coercion, it does so only because the SBA views some speech as outside the public interest. In other words, the SBA is concerned that its discrimination against constitutionally protected expression might be coercive. The SBA should not be concerned that without the opinion molder rule it would make coercive choices among different speakers. Under the First Amendment, those choices would be impermissible. The First Amendment stands for this nation's commitment to the idea that free speech is presumptively in the public interest. The SBA's unconstitutional proclivity to discriminate against protected expression does not justify the opinion molder rule.

I do not hold, however, that the SBA is powerless to promulgate regulations that effect particular forms of speech. Rather than inhibiting all expression, the SBA should carefully focus on the undesirable social consequences of particular kinds of speech in particular contexts, such as the harms associated with making sexually explicit material available to minors, *see Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), or imposing speech on unwilling listeners, *see Rowan v. Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). *See also Young v. American Mini Theatre,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Moreover, SBA benefits could be considered scarce public resources, like public airwaves, which would make them subject to greater regulation. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386, 89 S.Ct. 1794, 1804, 23 L.Ed.2d 371 (1969). Regulations could contain structural safeguards designed to avoid coercive political pressure. In short, speech-inhibiting regulations can only withstand constitutional scrutiny if they are narrowly tailored to promoting important public interests.[19]

---

**19.** "Less restrictive alternative" analysis has typically been applied in cases involving content-neutral restraints on expression in public forums. *See e.g. Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146. Although the present case bares certain similarities to those cases (public funds are like public forums), here, the speech-inhibiting regulation is decidedly not content-neutral.

The SBA's third asserted interest in promulgating the opinion molder rule was to avoid even the appearance of SBA subsidized political propaganda. For the three reasons articulated in this opinion's discussion of Mission's First Amendment rights, the government's interest in avoiding propagandistic entanglement with artistic expression is weak.[20]

### B. The Interests in Artistic Expression.

The Supreme Court has consistently recognized the value of artistic expression. *Schad v. Mount Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981). Art, perhaps more than other forms of expression, is valuable not only as a means to an end, but also as an end in itself. Art nurtures the artist's instinct for self-expression while enriching its audience. Because our nation respects the integrity of free human beings, it protects both the artist's right to create and the aficiando's right to enjoy. Moreover, art contributes to the marketplace of ideas by sharpening our feelings and guiding our thoughts into previously untilled fields of discussion. In short, artistic expression implicates the First Amendment's core values. The interests of the artists, the listeners and of this nation weigh heavily on the constitutional scales.

■ I conclude that these interests in free artistic expression outweigh the SBA's three asserted interests in maintaining the opinion molder rule. The regulation at issue unnecessarily inhibits artistic expression and must be struck down. An agency established to promote economic well-being by assisting viable small businesses may not deny benefits to applicants solely because they engage in constitutionally protected expression.[21]

### V. MISSION'S DAMAGES.

In addition to its claim for declaratory relief, Mission seeks damages from the SBA. The SBA argues first that sovereign immunity bars Mission's claim for damages. The doctrine of sovereign immunity bars suits against the United States absent the government's consent to be sued. *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980).

Under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (1982), a party adversely affected or aggrieved by an agency regulation can challenge the regulation's constitutionality by bringing an action for relief other than money damages. 5 U.S.C. §§ 701, 706 and 551(13)(1982). Therefore, government agencies are not immune from challenges to the constitutionality of their regulations.

Moreover, Congress has waived the SBA's sovereign immunity from claims for monetary damages. Under 15 U.S.C. § 634(b)(1)(1982), the SBA Administrator may:

"[S]ue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property."

---

Rather, the opinion molder rule inhibits speech because of the communicative impact of that speech. Thus, the government's interest in restraining expression warrants closer scrutiny than in the public forum cases.

**20.** This case presents somewhat unusual facts for which it appears appropriate to balance the competing interests to determine whether the First Amendment applies and then to balance the interest in freedom of expression against those favoring restraint on expression.

**21.** Mission has challenged the opinion molder rule on several other grounds that clearly have no merit. Mission's Equal Protection argument has potential, *see supra* at note 4, but it was not sufficiently developed. Nor do I see a need, given my conclusions based on the First Amendment alone, to open yet another constitutional can of worms.

The Tenth Circuit has held that § 634(b) authorizes claims for monetary damages against the SBA. *Mar v. Kleppe*, 520 F.2d 867, 870 (1975). Thus, the doctrine of sovereign immunity does not bar an aggrieved party from asserting claims for monetary damages against the SBA when challenging the constitutionality of its regulations.

The SBA contends that Mission must have some independent statutory basis for asserting its constitutional claim. To the contrary, a party whose constitutional rights have been violated can assert a claim directly under the Constitution itself. In *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court held that a "cause of action for damages" arises under the Constitution when Fourth Amendment rights are violated. Similarly, in *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Court held that a party can assert a claim for damages directly under the Due Process Clause of the Fifth Amendment to challenge unlawful sex discrimination. The Court's analysis in *Bivens* and *Passman* applies with equal force to Mission's claims for damages under the First Amendment. Certainly, if the SBA were to promulgate a regulation prohibiting loans to businesses run by women, under *Passman*, women denied loans because of the regulation would have the right to bring claims for damages against the SBA directly under the Constitution. Accordingly, I conclude that, under the First Amendment, Mission has a claim for relief for damages against the SBA.

Mission alleges that the opinion molder rule caused it damages of $232,756.84. Mission admits, however, that it only incurred expenses of $59,986.25 after it applied for an SBA loan guarantee. If Mission had received an SBA loan guarantee, it would have been able to meet its obligations under the lease agreement with Pride and thereby would have acquired value for its $232,756.84 expenditure.[22] In that sense, the opinion molder rule is a "cause in fact" of Mission's forfeiture. However, many circumstances constitute "causes in fact" without amounting to "legal" or "proximate" causes. *See* W. Prosser, *Law of Torts* 236–50 (1982). Here, for example, Mission's desire to open a dinner theatre and its inability to acquire financing from a private lender were causes in fact of its financial injury. Because those causes were unrelated to any legal wrong, they do not give rise to any claim for damages.

Mission may only recover its losses that were proximately caused by the SBA's unconstitutional regulation. Here, Mission lost money because it (1) made expenditures, but (2) could not obtain financing. With respect to Mission's first two lease-extending deposits and the expenses it incurred before applying for a loan guarantee, the SBA financial assistance program had no causal connection with Mission's losses. Mission would have made the expenditures and failed to obtain financing whether or not the SBA assistance program existed. The SBA regulation "caused" those financial damages only to the extent that the SBA failed to salvage Mission's initial losses. Given that Mission never even considered the possibility of obtaining SBA assistance before making those initial expenditures, I find and conclude that the SBA had no duty to salvage Mission's remote, initial losses.

Following those initial losses, however, the SBA's benefit program caused Mission to make additional expenditures and, ultimately, to be denied financing. I have concluded that Mission's reliance on the prospect of obtaining a loan guarantee did not give rise to a promissory estoppel claim because the SBA did not make representations that would have justified a reasonable prospective borrower to act in reliance. Nonetheless, in depositing an additional $50,000, Mission relied on at least the possibility of obtaining SBA financial assistance. Moreover, Mission reasonably expected that the program would be administered in

---

**22.** If Mission had paid Pride the amount necessary for making tenant improvements, its initial deposits would have been credited to its account.

accordance with the Constitution. Thus, the SBA financial assistance program caused both Mission's expenditure and its inability to receive financing. I find and conclude, therefore, that the SBA caused Mission damages of $59,986.25.

Accordingly,

IT IS ORDERED that

(1) The opinion molder rule, 13 C.F.R. 120.2(d)(4)(1985), insofar as it prevents SBA loans to dinner theatres is unconstitutional and may not be applied in this case;

(2) Defendant SBA shall pay the plaintiff Mission damages of $59,986.25.